478 So.2d 1077 (1985)
Maurice FERRE, Appellant/Cross-Appellee,
v.
The STATE of Florida, ex rel. Janet Reno, As State Attorney of the Eleventh Judicial Circuit, Appellee/Cross-Appellant.
No. 84-2102.
District Court of Appeal of Florida, Third District.
August 13, 1985.
*1078 Fine, Jacobson, Schwartz, Nash, Block & England and Mitchell R. Bloomberg, Miami, for appellant/cross-appellee.
Jim Smith, Atty. Gen., and Janet Reno, State Atty., and Anthony C. Musto, Asst. State Atty., for appellee/cross-appellant.
Before SCHWARTZ, C.J., and DANIEL S. PEARSON and JORGENSON, JJ.
DANIEL S. PEARSON, Judge.
The appellant, Maurice Ferre, is the Mayor of the City of Miami. Following his re-election to that office in November 1981, he accepted and retained $35,000 in the form of 35 post-election contributions of $1,000 each.
Some time later, the State filed a civil complaint against Ferre, in which, as amended, it was alleged that he had accepted and failed to return the $35,000 of post-election contributions in violation of Sections 106.141(10)[1] and 106.08(2)[2], Florida Statutes (1981), respectively. The State asked that the trial court assess a $1,000 civil penalty on account of Ferre's acceptance of the contributions,[3] and a civil penalty of "twice the amount contributed" on account of Ferre's failure to return the contributions.[4]
Ferre responded by asserting that (1) Florida's statutes prohibiting a candidate *1079 for office from accepting post-election contributions and requiring that a candidate who has accepted post-election contributions return them infringe upon his free exercise of political speech and thereby are unconstitutional as violative of rights guaranteed him by the First Amendment to the United States Constitution; (2) the money received by him does not fall within the definition of contributions under the statutes involved; and (3) the mandatory penalty of "twice the amount contributed" set forth in Section 106.08(5) violates the constitutional prohibition against excessive punishment. There being no genuine issue of material fact requiring resolution, the trial court entered summary judgment for the State, limiting, however, the penalty for violation of Section 106.08(5) to $35,000. Ferre appeals, and the State cross-appeals.
Ferre's claims here are identical to his claims in the court below, and we reject them in their entirety. Thus, we differ from the trial court in one respect only: the trial court having found that Ferre received and failed to return $35,000 in post-election contributions, it was required by Section 106.08(5), Florida Statutes (1981), to order Ferre to pay as a penalty a sum equal to twice the amount of the contributions, that is, $70,000, since such a penalty, in our view, is not unconstitutionally excessive.
We assume for present purposes that the statutes prohibiting the acceptance, and requiring the return, of post-election contributions impact on rights guaranteed by the First Amendment to the United States Constitution,[5] that Ferre has standing to challenge their constitutionality,[6] and that they significantly limit First Amendment rights rather than merely regulate the time, place and manner of expression.[7] However, because even a significant interference with the freedom of political association[8] will be sustained where the State, as here, "demonstrates a sufficiently important interest and means closely drawn to avoid unnecessary abridgement of associational freedoms," Buckley v. Valeo, 424 U.S. 1, 25, 96 S.Ct. 612, 638, 46 L.Ed.2d 659, 691 (1976); see also Cousins v. Wigoda, 419 U.S. 477, 488, 95 S.Ct. 541, 548, 42 L.Ed.2d 595, 604 (1975); NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405, 421 (1963); Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231, 237 (1960), we conclude that the statutes under attack are not unconstitutional.
What, then, are the sufficiently important or compelling state interests which are advanced by the statutes under consideration? The first, as should be obvious, is the prevention of corruption and the appearance of corruption. Surely, the Legislature could determine that a post-election contribution to a winning candidate could *1080 be a mere guise for paying the officeholder for a political favor. At the least, such a contribution, if not in fact corrupt, could be viewed by the public as corrupt.[9] As the United States Supreme Court recently noted in Federal Election Commission v. National Conservative Political Action Committee, ___ U.S. ___, ___, 105 S.Ct. 1459, 1469, 84 L.Ed.2d 455 (1985), "[t]he hallmark of corruption is the financial quid pro quo: dollars for political favors." Indeed, in Buckley v. Valeo, the Court solely relied on the governmental interest in preventing corruption and the appearance of corruption as its basis for upholding the limitations on the amount of contributions:
"It is unnecessary to look beyond the Act's primary purpose  to limit the actuality and appearance of corruption resulting from large individual financial contributions  in order to find a constitutionally sufficient justification for the $1,000 contribution limitation... . To the extent that large contributions are given to secure political quid pro quos from current and potential office holders, the integrity of our system of representative democracy is undermined... .
"Of almost equal concern as the danger of actual quid pro quo arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in financial contributions."

Buckley v. Valeo, 424 U.S. at 26-27, 96 S.Ct. at 638-39, 46 L.Ed.2d at 692.
A second compelling governmental interest is the goal of allowing the public to be informed before an election of the identities of persons contributing to the campaign of a particular candidate. In the absence of the challenged statutes, a candidate could conceal the identity of supporters until after the election when it is too late for the revelation to be considered by the voters in casting their ballots.[10] Again, the State's interest in this regard, as recognized in Buckley v. Valeo, is significant:
"[D]isclosure provides the electorate with information `as to where political campaign money comes from and how it is spent by the candidate' in order to aid the voters in evaluating those who seek federal office. It allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches. The sources of a candidate's financial support also alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office."

Buckley v. Valeo, 424 U.S. at 66-67, 96 S.Ct. at 657, 46 L.Ed.2d at 715 (footnote omitted).
These compelling interests are recognized as being among the most fundamental interests that the government has in regulating the electoral process:
"In the last two decades, Congress and almost all the States have passed laws regulating campaign financing. Analyzing these laws, commentators have delineated the following four legislative goals: stemming the rising costs of campaigns; maximizing the distribution to the public of information about the candidates; equalizing the opportunity of every aspirant to political office; and reducing the potential for corruption by large contributors. Theoretically, a law that achieves *1081 these four goals would be considered an ideal regulation of a privately or publicly financed electoral system."
Moynahan, Florida's Campaign Finance Law: A Restoration of the Public's Confidence, 28 U.Fla.L.Rev. 458, 459 (1976) (footnotes omitted).
We think it clear that the challenged statutes are reasonably designed to maximize the distribution of information by allowing the public to be aware of a candidate's financial supporters at a time when such awareness can have an impact at the polls, and reduce the potential for corruption and the appearance of corruption by removing the possibility of the giving of a post-election contribution in return for a political quid pro quo. When we weigh these compelling governmental interests against the minimal impact on First Amendment rights, we can only conclude that the regulations are not constitutionally infirm. Ferre, however, argues that Sadowski v. Shevin, 345 So.2d 330 (Fla. 1977), dictates a contrary result. There, the Florida Supreme Court invalidated a statute that precluded a candidate from making major political expenditures prior to qualifying for office.[11] We find Sadowski plainly distinguishable from the present case. First, the statute in Sadowski, being directed to expenditures, was a much more severe intrusion into First Amendment rights than are the present statutes. Indeed, this very distinction between expenditures, as in Sadowski, and limitations on contributions, as here, formed the basis for the Court in Buckley to find unconstitutional limits on expenditures by candidates, while upholding limits on contributions. See Federal Election Commission v. National Conservative Political Action Committee, 53 U.S.L.W. at 4296.
"[A]lthough the Act's contribution and expenditure limitations both implicate fundamental First Amendment interests, its expenditure ceilings impose significantly more severe restrictions on protected freedoms of political expression and association than do its limitations on financial contributions."
424 U.S. at 23, 96 S.Ct. at 636, 46 L.Ed.2d at 690.
Second, none of the compelling governmental interests which support the statutes here under consideration were involved in Sadowski, and, indeed, the governmental interest advanced in support of the statute in Sadowski  to prevent less than serious candidates from seeking office  was found not to be served by the statute limiting expenditures.
Ferre also asserts that the governmental interests could be satisfied by less restrictive means. His argument here, however, is limited to the singular proposition that the goal of preventing corruption and the appearance of corruption can be achieved by less intrusive means. The argument ignores the other compelling governmental interest which justifies the statute.
We turn now to Ferre's contention that since Section 106.011(3)(a), Florida Statutes (1981), defines "contribution" as "[a] gift, subscription, conveyance, deposit, loan, payment, or distribution of money or anything of value ... made for the purpose of influencing an election," money given after an election cannot constitute a contribution, as it cannot be given for the purpose of influencing an election that has already been held. We find no merit in this contention.
Section 106.011, Florida Statutes, expressly provides that the terms it defines shall have the meanings set forth, "unless the context clearly indicates otherwise." The context in which the challenged statutes use the term "contribution" clearly indicates that the term includes post-election contributions.
Sections 106.141 and 106.08 deal specifically with contributions received after an election. If the definition of "contribution" found in Section 106.011(3)(a) were used, Sections 106.141 and 106.08 would be nullities, since a contribution, according to *1082 the definition contained in Section 106.011(3)(a) could not be made after an election. Clearly, when the use of a statutory definition results in a manifest incongruity, as would be the case here, that definition should not be employed. See Lawson v. Suwanee Fruit and Steamship Co., 336 U.S. 198, 201, 69 S.Ct. 503, 504, 93 L.Ed. 611, 614-15 (1949). Rather, "the primary and overriding consideration in statutory interpretation is that a statute should be construed and applied so as to give effect to the evident intent of the legislature regardless of whether such construction varies from the statute's literal meaning." State v. Nunez, 368 So.2d 422, 423 (Fla. 3d DCA 1979). Even when strict construction of a statute is appropriate, "such strict construction is subordinate to the rule that the intention of the law-makers must be given effect." State ex rel. Washington v. Rivkind, 350 So.2d 575, 577 (Fla. 3d DCA 1977). In the present context, there is little question that the legislature did not intend that the statutory definition of "contribution" be applied to the statutes under review, since such an application would plainly frustrate legislative intent and would, moreover, compel the absurd conclusion that the legislature meant to enact a statute that had no effect or meaning. It is, of course, a well settled principle that courts should avoid interpreting statutes in ways which ascribe to the legislature an intent to create an absurd result. See McKibben v. Mallory, 293 So.2d 48 (Fla. 1974); City of St. Petersburg v. Siebold, 48 So.2d 291 (Fla. 1950); Winter v. Playa del Sol, Inc., 353 So.2d 598 (Fla. 4th DCA 1977). See also Dickinson v. Davis, 224 So.2d 262, 264 (Fla. 1969) ("It is never presumed that the Legislature intended to enact purposeless or useless legislation."); Allied Fidelity Ins. Co. v. State, 415 So.2d 109, 110-11 (Fla. 3d DCA 1982) ("[A]n axiom of statutory construction [is] that an interpretation of a statute which leads to an unreasonable or ridiculous conclusion or a result obviously not designed by the Legislature will not be adopted."). Therefore, because the context in which the term contribution is used in Sections 106.141 and 106.08 requires a different meaning than that set forth in Section 106.011(3)(a), a contribution need not be made for the purpose of influencing an election in order for a violation of Sections 106.141 or 106.08 to be found.
Lastly, we consider the State's contention on its cross-appeal that the trial court, having found that Ferre received and failed to return $35,000 of contributions, erred in not imposing a $70,000 penalty under Section 106.08(5). The statute provides:
"Any person who knowingly and willfully violates the provisions of this section shall, in addition to any other penalty prescribed by this chapter, pay to the State a sum equal to twice the amount contributed in violation of this chapter. Each campaign treasurer shall pay all amounts contributed in violation of this section to the State for deposit in the General Revenue Fund."
Without dispute, this provision is mandatory in nature, since the word "shall," when used in such a statute, carries such a connotation. See Neal v. Bryant, 149 So.2d 529 (Fla. 1962); Florida Tallow v. Bryan, 237 So.2d 308 (Fla. 4th DCA 1970). The trial court, however, finding that "the mandatory imposition of the penalty as requested by the State, as applied to the facts in this case, would be unreasonably harsh and oppressive and would bear no reasonable relationship to the offense committed or the wrong sought to be redressed," imposed a civil penalty against defendant in the amount of $35,000, the exact amount of money unlawfully accepted by defendant.
Ferre does not contend that the provision is not mandatory. Instead, he argues that the imposition of such a fine would be unconstitutionally excessive. We think, however, that when the fine imposed is, as it was below, an amount equal to the amount of money unlawfully accepted and retained, the fine does no more than put the defendant in the same position as he would have been in had he not violated the law. In essence, then, such a penalty is not a penalty at all. In contrast, the penalty provided for by statute of a sum equal to twice the amount of money unlawfully accepted and retained clearly bears a rational *1083 relationship to the statutory violation as it increases in direct relation to the amount of money unlawfully accepted and retained.
In Amos v. Gunn, 84 Fla. 285, 364, 94 So. 615, 641 (1922) (on rehearing), the court announced that a fine is not "excessive in violation of the Constitution unless it is plainly and undoubtedly in excess of any reasonable requirements for redressing the wrong." Clearly, the fine here is not in excess of any reasonable requirement for redressing the wrong. Indeed, the constitutional propriety of a fine that doubles the amount of money involved in the violation of a law has already been recognized. In Baeumel v. State, 26 Fla. 71, 7 So. 371 (1890), the plaintiff in error was found to have sold spirituous, vinous and malt liquors without having paid a required license tax of $300.00. The law set the penalty for such a violation "at not less than double the amount required for such license." 26 Fla. at 74, 7 So. at 372. The trial court imposed a fine of $900.00. On appeal, the court stated:
"Under the statute, the judge could not fine the accused less than double the tax required for a license to sell spirituous, vinous, and malt liquors, $600; but he could impose a fine in excess of that amount, provided the fine imposed did not violate the bill of rights, which prohibits `excessive' fines. In the case of Frese v. State, 23 Fla. 267, 2 South. Rep. 1, it is held that a fine of $900, under the same statute that the plaintiff in error was convicted under, was not excessive; and we so hold in this case."
26 Fla. at 77, 7 So. at 373.
Surely, if a statute requiring a minimum fine of twice the amount of money involved in an unlawful act is proper, and if, under that statute, fines that triple the amount of money are upheld, there can be no question that the statute here does not require the imposition of an excessive fine under the Florida Constitution.[12]
For the reasons given, the judgment of the case is remanded to the trial court to modify the penalty of $35,000 to $70,000, and, as modified, the judgment is affirmed.
Affirmed in part; reversed in part, and remanded with directions to modify the penalty.
NOTES
[1] Section 106.141(10) provides:

"Any candidate, or any person on behalf of a candidate, who accepts contributions after such candidate has withdrawn his candidacy, after the candidate has been eliminated as a candidate or elected to office, or after the second anniversary of the date the campaign account of such candidate was established, is guilty of a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083."
[2] Section 106.08(2) provides:

"Any contribution received by a candidate with opposition in an election or the campaign treasurer or a deputy treasurer of such candidate, or by the treasurer or a deputy treasurer of a political committee supporting or opposing a candidate with opposition or supporting or opposing an issue on the ballot in an election, on the day of that election or less than 5 days prior to the day of that election shall be returned by him to the person or political committee contributing it and shall not be used or expended by or on behalf of the candidate or political committee. Any contribution received by a candidate or the campaign treasurer or a deputy treasurer of a candidate after the date at which the candidate withdraws his candidacy, or after the date the candidate is defeated or elected to office, shall be returned to the person or political committee contributing it and shall not be used or expended by or on behalf of the candidate."
[3] Section 775.083(1)(d) provides that the fine for a conviction of a misdemeanor of the first degree shall not exceed $1,000.
[4] Section 106.08(5) provides:

"Any person who knowingly and willfully violates the provisions of this section shall, in addition to any other penalty prescribed by this chapter, pay to the state a sum equal to twice the amount contributed in violation of this chapter. Each campaign treasurer shall pay all amounts contributed in violation of this section to the state for deposit in the General Revenue Fund."
[5] The State contends that no First Amendment right is impacted, since the expression protected by the First Amendment is merely the "symbolic act of contributing," Buckley v. Valeo, 424 U.S. 1, 21, 96 S.Ct. 612, 635, 46 L.Ed.2d 659, 689 (1976), which is no less symbolic where the contribution is returned rather than used by the candidate. Ferre says that there is no meaning, symbolic or otherwise, to a contribution where it is known at the outset that the contribution cannot be used by the candidate.
[6] Here the State contends that assuming constitutional rights could be said to be affected, the rights are those of the contributors, not the candidate. Ferre says that the rights of the contributor and the candidate are virtually inseparable.
[7] The State argues that a government may adopt reasonable time, place and manner regulations of expression and that the Florida Statutes under consideration do nothing more than limit the time within which contributions can be made and are reasonable. Ferre says the statutes in question impose a ban on contributions and as such prohibit, rather than delay, expression.
[8] In considering limitations on political contributions, "the primary First Amendment problem raised ... is their restriction of one aspect of the contributor's freedom of political association." Buckley v. Valeo, 424 U.S. 1, 24-25, 96 S.Ct. 612, 637, 46 L.Ed.2d 659, 691 (1976). The freedom of political association, "like free speech, lies at the foundation of a free society." Id. at 25, 96 S.Ct. at 637, 46 L.Ed.2d at 691; Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).
[9] It could be argued that pre-election contributions are fraught with the same dangers. Of course, legislation is not rendered unconstitutional merely because it proscribes more narrowly rather than more broadly. There is, however, a rational distinction between a bet and a bet on a sure thing. As one wag put it: "Forecasting is very difficult, especially if it's about the future." Paul Dickson, The Official Rules (1978) (citing Fiedler's First Law of Forecasting).
[10] For example, if post-election contributions were allowed, a candidate could make large expenditures, secure in the knowledge that immediately after the election members of some currently unpopular group whose support for the candidate had not theretofore been disclosed would send in contributions to pay off the deficit. The result, of course, would be that voters may have been deceived into voting for a candidate with allegiances, or at least bedfellows, with which they violently disagree.
[11] The effect in Sadowski was to prevent expenditures until the sixty-third day prior to the first primary.
[12] Nor does the mandatory penalty violate the separation of powers clause of the Florida Constitution. See Art. II, § 3, Fla. Const. The power to impose fines is not judicial in nature. It is a "discretionary power of the law-making department ... to redress wrongs," and the power "is limited only by the organic provisions requiring due process and equal protection of the laws to be observed and forbidding excessive fines to be imposed." Amos v. Gunn, 84 Fla. 285, 363, 94 So. 615, 641 (1922) (on rehearing). See 36A C.J.S. Fines § 2 (1961) ("Subject to constitutional restriction, the imposition and regulation of fines rests within the discretion of the legislature."). The general proposition that a mandatory minimum prison sentence "that has been established by the legislature and is not on its face cruel and unusual ... will be sustained as against attacks based on due process, equal protection, separation of powers and legislative usurpation arguments," Scott v. State, 369 So.2d 330, 331 (Fla. 1979), is, a fortiori, applicable to a mandatory minimum monetary penalty.